COMMONWEALTH *vs.* WILLIAM GERAWAY.

Norfolk. February 3, 1969. — March 7, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, & REARDON, JJ.

*Homicide. Identification. Evidence,* Admissions and confessions, Hearsay, Judicial discretion.

At the trial of an indictment for murder nearly two years after the victim was shot and his body was found lying on a road, testimony of a number of witnesses relating to a yellow automobile hired by the defendant on the day before the murder and burned after the murder, and to his behavior and admissions, warranted a verdict of guilty of murder in the first degree [437–438]; justice did not require disturbing the judgment under the authority of G. L. c. 278, § 33E, as amended through St. 1962, c. 453 [441].

Upon appeal from a conviction of murder by shooting, where it appeared that several months after the murder and prior to any indictment against the defendant, and while he was confined in a Connecticut penitentiary, police showed pictures of him and others to the operators of two automobiles who, on the morning of the murder, had passed a yellow automobile shortly before they saw the body of the victim lying in the road, that such operators picked out pictures of the defendant as the driver of the yellow automobile, and that such operators' later in-court testimony identified the defendant as its driver, it was held that there was no reason to regard the "photographic identification procedure" adopted by the police as having been "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," and that in the circumstances there was no error in the admission in evidence of the identification testimony. [440]

At the trial of an indictment for murder by shooting with a pistol, there was no abuse of discretion in the exclusion of a statement, possibly showing consciousness of guilt on the part of its maker, made shortly after the murder to a witness by one who had purchased the pistol from the witness before the murder and who had been acquitted of the murder. [440–441]

INDICTMENT found and returned in the Superior Court on September 29, 1967.

The case was tried before *Hennessey, J.*

*Monroe L. Inker* (*Paul M. Sullivan* with him) for the defendant.

*Richard W. Barry,* Assistant District Attorney, for the Commonwealth.

CUTTER, J. Geraway, on September 29, 1967, was charged by indictment with the murder of David Martin Sidlauskas on April 24, 1966, in Quincy not far from the Long Island Hospital. At the trial (February 7–20, 1968) he was found guilty of murder in the first degree. The jury recommended that the death penalty be not imposed. Geraway appealed. G. L. c. 278, §§ 33A–33G.

Only a few assignments of error have been argued. It is desirable, however, as background for consideration of even these assignments (and in connection with the performance of the duty imposed on us in a capital case by G. L. c. 278, § 33E, as amended through St. 1962, c. 453), to state briefly the principal circumstances of the homicide which, on the evidence, the jury would have been warranted in finding.[1]

On Sunday morning, April 24, 1966, Sidlauskas's body was found lying on a road on Moon Island near a gatehouse. He had been hit by two forty-five calibre pistol bullets, one of which caused his death. The body was found about 6:45 A.M. Blood was observed inside the gatehouse and on the road. Post mortem examination showed that Sidlauskas had been drinking heavily in the hours preceding his death.

Geraway was not the first person tried for Sidlauskas's murder. The record reveals little about the earlier trial of one Ronald Jackman who was acquitted. It is stipulated that Jackman stated to police officers that he left Sidlauskas about 11 P.M. on April 23; that Jackman's wife testified at the earlier trial that Jackman was at home by midnight on

---

[1] In the Commonwealth's six page brief (a) there are stated few of the facts brought out at a murder trial which consumed twelve trial days, and (b) only four page references are made to the 1,567 page transcript of testimony. Counsel for the Commonwealth, like counsel for other parties, should comply with our rules. See S. J. C. Rule 1:15, 351 Mass. 738.

the twenty-third and was still there when she awoke the next morning. At Geraway's trial, the evidence indicated that the fatal shot was fired from a forty-five calibre pistol, sold to Jackman by Richard Selter. The disassembled pieces of this gun were found near the place where the body was discovered. Jackman had claimed earlier that the gun had been stolen from him the week before the murder.

Against Geraway there was introduced substantial evidence of admissions by him of his responsibility for the death of Sidlauskas. This, and other significant evidence of his activities in and after March, 1966, are summarized below.

Geraway, prior to April, 1966, had been confined in the Correctional Institution at Walpole. On April 23 Carol Kennedy, who had been married to Geraway and later divorced, went with him to a gasoline station in Chestnut Hill and there rented a yellow Ford Falcon with a black interior. Geraway left her at her house.

The next morning, April 24, Miss Ruth Raycraft, a supervisor of nurses at Long Island Hospital, while driving to her work about 6:30 A.M. passed only one automobile between Squantum and the place were Sidlauskas's body was found. This was a "yellow small car . . . a compact-type car." It contained two persons. At the trial she identified the driver as Geraway. Nearer the hospital she saw a "body . . . in the road." She "slowed down, looked at the body and speeded ahead to get help from the guards" at Long Island Hospital.

John Lashus, then employed as a security policeman at Long Island Hospital, at 6:15 A.M. went to Fields Corner. On his return trip, he passed a small yellow automobile, which was "more than half . . . on . . . [his] side of the road." It contained two people. At the trial, he identified Geraway as the driver of the yellow automobile. About two minutes after passing that vehicle, he also saw Sidlauskas's body lying in the road and reported it.

Several witnesses testified to reports of the murder made to them by Geraway. Certain aspects of their testimony are set forth below.

Patricia Dunn lived in an apartment in Dorchester with William Dennett. She first met Geraway with Dennett not long before April 24, 1966. That day about 7:30 A.M. Geraway, wearing a sweater belonging to Dennett, came to her house. Geraway said to her, "I think I just killed a man," and asked to use the telephone. He also "asked for the radio" and "listened to the next news broadcast." Then "he mumbled to himself, 'They found him.'" At the trial she recognized a piece, cut from a photograph of Geraway taken in March, 1966, as being a picture of the sweater worn by Geraway that morning.

Geraway's former brother-in-law, Edward Kennedy, on one Sunday morning in April, 1966, saw Geraway at his mother's house talking to Kennedy's sisters, Michelle LeClair and Carol Kennedy. Geraway told him that "he whacked a guy last night," because he "aggravated me." Carol Kennedy testified that Geraway on that Sunday morning "[s]aid to turn on the radio, he killed a guy." When she asked "why he killed a guy," he "said he thought it was Billy Dennett's wife's boyfriend." Geraway appeared nervous. The next day he asked her to call the gasoline station where they had rented the automobile, "so he could keep the car another day." She would not do it, but her sister Michelle did.

On April 28, 1966, Geraway again came to her house and remained a week. He "didn't want to leave . . . because somebody might be able to identify him" and "because . . . a couple of nurses that saw him coming down from Moon Island [near the scene of the homicide] might see him." Just before he left, he "said he was going to take off for a while," because things "were too warm around here." He then had long hair. When she next saw him in the middle of May, he "had a flat top."[2]

---

[2] She identified the same picture of a sweater, already mentioned, as showing the garment Geraway was wearing on April 24. Michelle LeClair gave testimony closely similar to that given by her sister about what Geraway said on the morning of April 24. "He said he knocked off a man up in Moon Island" and "shot him about three times" and "mentioned something about a couple of nurses might have seen the yellow car."

William Dennett, at the time of trial confined at Dedham jail on transfer from the Marquette (Michigan) prison, gave his occupation as "check passer." He first met Geraway at Walpole State Prison. Dennett saw Geraway every day in the pertinent period in April, 1966, at the apartment where Dennett was living with Patricia Dunn. When, on the morning of April 24, Dennett returned, Geraway was "talking on the phone." Geraway reported to Dennett that he thought he "had just killed a guy . . . [at] Moon Island," and that he did not know whether two nurses could identify him. The gun, he said, was a forty-five calibre pistol which "Eddie borrowed . . . off a guy . . . named Jackman." Dennett advised him to get rid of the yellow Ford and to keep his mouth shut. Geraway said that he had been at Walter's After-Hours Club in Roxbury and "had a fight with the guy . . . [who] pulled a knife." He took the man to Moon Island on the pretext that "there was some money dumped there." When they got there, "they had a couple of beers," and entered a building. There Geraway blinded the victim with tear gas, and shot him. Later Dennett talked about the shooting with Geraway and his ex-wife at the latter's apartment. On a still later occasion, Dennett advised Geraway to burn the yellow automobile and assisted one Kelley to do it.

In May, Dennett and Geraway drove to Michigan. There they both were arrested. Geraway was released on bail. Raymond V. DeFalco, who had known Dennett casually for some time, drove Geraway to Boston. En route, Geraway gave DeFalco an account of killing Sidlauskas.

The testimony summarized above was given by a number of witnesses. Dennett was shown to have been confined at Walpole. Some, including Dennett, either strongly disliked Geraway or had reason to do so. Some had testified in the earlier trial of Jackman or at one or more grand jury investigations, or upon interrogation by police investigators. The testimony of some witnesses varied to a certain extent from that of others and from one examination to another. The trial was nearly two years after the homicide, so that

the testimony was subject to the risks of imperfect memory. Nevertheless, the evidence was consistent in a general way.[3] If believed, the testimony relating to the yellow automobile and to Geraway's behavior and admissions thoroughly warranted the jury's verdict, wholly apart from the identification testimony of Ruth Raycraft and John Lashus to which Geraway's principal assignment of error is directed.

1. Geraway contends that the testimony of Miss Raycraft and John Lashus identifying Geraway was improperly admitted under principles discussed in *United States* v. *Wade,* 388 U. S. 218, 229–238, *Gilbert* v. *California,* 388 U. S. 263, 269–274, and *Simmons* v. *United States,* 390 U. S. 377, 383–384,[4] because of the pre-trial interrogation of these witnesses with the assistance of photographs. We think nothing in these cases precludes the use of the identification testimony.

The transcript of Miss Raycraft's testimony strongly suggests that she was a precise, conscientious witness. The vehicle which she saw on the road into Long Island Hospital was not going fast. She slowed somewhat because she "thought . . . [an occupant] was a person . . . [she] knew and . . . looked at the person driving . . . who turned and smiled at" her. She identified a picture of the yellow automobile. Under cross-examination she conceded that each vehicle was moving and that she had only a few seconds to observe the driver of the other automobile. She observed no scars on the driver's forehead.[5] After April 24, 1966, she did not see Geraway until the afternoon before her testimony, when she had seen him in a corridor in the

---

[3] The trial judge permitted a wide range of cross-examination. He took great pains to avoid the introduction of prejudicial evidence concerning other alleged criminal activity of Geraway in the spring of 1966. He afforded to diligent defence counsel, assigned by the court, reasonable access to grand jury minutes and pre-trial interrogation transcripts, so that any inconsistencies in witnesses' statements could be the basis of cross-examination.

[4] The *Simmons* case was decided about a month after the trial of Geraway. *Stovall* v. *Denno,* 388 U. S. 293, 296–301, holds that the *Wade* case has application to confrontations for identifications only after June 12, 1967.

[5] At least one other witness had testified that in April, 1966, Geraway's face was badly scratched because of an automobile accident.

court house. He had smiled as he walked past her. Seeing that smile made her positive of her identification.

In the winter of 1967, she and another nurse were shown by Lieutenant Ingenere of the Boston police a number of pictures (she thought about eight to ten) of young men about the same age. She was not told that a suspect was in one of the pictures. She finally selected three pictures, which, in either full face or profile, she thought resembled the man she saw. She was told that in each instance she had picked out a picture of Geraway.

John Lashus, in the winter of 1966–1967, after being questioned on two days, was shown a number of pictures by Lieutenant Ingenere. It is not clear whether these were the same pictures shown to Miss Raycraft. Fifteen or sixteen were later introduced in evidence. Each contained two photographs (front face and profile) of an individual young male. Lashus regarded only seven as photographs of big men. Of these two only had full heads of hair. The man he had seen was a big heavy set man with dark bushy hair. From this group of pictures, Lashus picked out about five, from which he selected one which he thought, "looks like the guy that I saw . . . that morning." In the court room he identified Geraway as the man he had seen.

Miss Raycraft and Lashus were each subjected to searching cross-examination. Various possible infirmities in the identification and in the witnesses' opportunities for observations were fully discussed. The witnesses' prior statements, or relevant excerpts, were scrutinized by the trial judge for inconsistencies and were marked for identification. A broad inquiry was permitted about the photographs and their pre-trial viewing.

Even if Geraway was then confined in a Connecticut penitentiary and hence was available for a lineup, it still was not unreasonable for the Boston police to test these witnesses by photographs before taking the witnesses to Connecticut and embarking on further out-of-State investigation. There appears to have been no unreasonable selection of pictures for Lashus to examine. They included two double pictures

of Geraway and two double pictures of one Thompson.[6] Only one set of pictures of each other individual was included.

Taking into account all the circumstances, we perceive no reason for excluding the identification testimony. To the extent that the testimony may have had infirmities, that was a matter of the weight to be given to the testimony by the jury. This is not a post-indictment lineup case. In such an identification (see fn. 4) after the *Wade* case, 388 U. S. 218, 236–237, consideration, of course, should have been given to the presence of counsel for Geraway. The use of the photographs by Lieutenant Ingenere was in the winter of 1967, long prior to the indictment (September 29, 1967). We find no sufficient reason for regarding the "photographic identification procedure" as having been "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." See the *Simmons* case, 390 U. S. 377, 384.[7] See also *Commonwealth* v. *Nassar*, 354 Mass. 249, 259–262; *Commonwealth* v. *Sullivan*, 354 Mass. 598, 604–606.

2. Geraway's counsel attempted to prove through Richard Selter, who had sold Jackman a forty-five calibre pistol, that Jackman had a conversation with Selter shortly after the death of Sidlauskas which might be interpreted as showing Jackman's consciousness of guilt of that murder. In the trial of Jackman for the murder of Sidlauskas, that statement might have been used against Jackman as possibly showing consciousness of guilt. See *Commonwealth* v. *Burke*, 344 Mass. 243, 247–248. In the trial of Geraway, it would

---

[6] The two sets of pictures of Geraway differ from one another substantially. In one set his hair is long and untidy and in the other set it is shorter and neat. The two pictures of Thompson vary in like manner.

[7] Other Federal cases seem generally in accord with our conclusion, although the time interval between the crime and the identification was shorter in those cases. See *Hanks* v. *United States*, 388 F. 2d 171, 173–174 (10th Cir.), cert. den. 393 U. S. 863; *United States* v. *Hutto*, 393 F. 2d 783, 784–785 (4th Cir.); *Cline* v. *United States*, 395 F. 2d 138, 142–143 (8th Cir.); *United States* v. *Clark*, 289 F. Supp. 610, 614–616, 620–623 (E. D. Pa.). See also *United States* v. *Marson*, 408 F. 2d 644, 651 (4th Cir.); *Pearson* v. *United States*, 389 F. 2d 684, 686–688 (5th Cir.); *United States* v. *Trivette*, 284 F. Supp. 720, 724 (D. D. C.). Cf. also *Smith* v. *United States*, 413 F. 2d. 366 (Ct. App. D. C.).

not constitute an admission but would be hearsay. In some respects the excluded material was a duplication of the stipulation concerning Jackman which has been mentioned earlier in this opinion. Geraway apparently relies upon decisions permitting a trial judge in a criminal case in his discretion to admit evidence "not too remote in time" and "not too weak in probative quality" to show one other than the defendant had "motive, intent, [and] opportunity" to have committed the crime. Cf. *Commonwealth* v. *Murphy*, 282 Mass. 593, 597–600; *Holt* v. *United States*, 342 F. 2d 163, 165–167 (5th Cir.). In the circumstances, the judge, in his discretion, reasonably could exclude the offered evidence. The conversation between Selter and Jackman was inconclusive hearsay, and weak in probative value. It had no such tendency to exculpate Geraway as to make it inappropriate for the prosecutor to object to its admission.

3. We perceive no reason in justice for disturbing the judgment under the authority given to us by G. L. c. 278, § 33E (as amended through St. 1962, c. 453).

*Judgment affirmed.*