COMMONWEALTH *vs.* WILLIAM GERAWAY.

Norfolk.    November 7, 1972. — October 11, 1973.

Present:    TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & WILKINS, JJ.

*Practice, Criminal,* Assistance of counsel, New trial, Capital case. *Conflict of Interest.*

Where members of a law firm, other than a member who was the attorney for a defendant tried for first degree murder, represented in unrelated matters persons who became important prosecution witnesses at the murder trial and where the insistent inquiries by the defendant of his attorney as to the existence of conflicts of interests were ignored or summarily put to rest, there was a "miscarriage of justice" under G. L. c. 278, § 33E, necessitating a new trial, even though the defendant's attorney was unaware of the dual representation by the other members of the firm and conducted a vigorous and competent defence. [170-175] TAURO, C.J., and BRAUCHER, J., dissenting.

Where this court, following an appeal from a decision by the Superior Court denying a motion for a new trial of a capital case filed after rescript affirming a judgment of conviction, decided on new matter not considered by it previously that there had been a miscarriage of justice requiring a new trial it also concluded that it was unnecessary to remand the case to a single justice under G. L. c. 278, § 33E. [175-176]

INDICTMENT found and returned in the Superior Court on September 29, 1967.

Following the decision by this court reported in 355 Mass. 433, denial of a motion for a new trial by the Superior Court, and an appeal therefrom, the case was reviewed by this court under G. L. c. 278, § 33E.

Commonwealth *v.* Geraway.

*Steven B. Duke,* of Connecticut, for the defendant.

*John P. Connor, Jr.,* Assistant District Attorney (*Richard W. Barry,* Special Assistant District Attorney, with him) for the Commonwealth.

REARDON, J.   The defendant was indicted on September 29, 1967, for murder in the first degree of David Martin Sidlauskas on April 24, 1966, and after a twelve day trial was, on February 20, 1968, convicted and sentenced to life imprisonment. He appealed to this court, assigning as error the admission of eyewitness identification testimony and the exclusion of evidence implicating another person in the crime. We affirmed the judgment. *Commonwealth* v. *Geraway,* 355 Mass. 433 (March 7, 1969).

On November 10, 1970, the defendant filed a motion for a new trial alleging, inter alia, that newly discovered evidence revealed a "conflict of interest on the part of the law firm that represented petitioner at trial so severe that it resulted in a denial of the right to effective counsel as guaranteed in the 6th Amendment of the Constitution of the United States, and the right to equal protection of the law, as guaranteed in the 14th Amendment."

After an evidentiary hearing the trial judge denied the motion.[1] The defendant excepted to the denial and claimed an

---

[1] In his findings, rulings and order relative to the defendant's motion, the judge stated as follows: "1. Attorney Munroe Inker was trial attorney for the defendant herein at the trial of this indictment. 2. At all material times, before and during the said trial, Mr. Inker was a partner in the law firm of Crane, Inker and Oteri. 3. Before and during the said trial the said firm, or certain attorneys associated with the firm, represented as attorneys one William Dennett and certain members of the Kennedy family of Roxbury in certain legal matters. These legal matters were not related to the within murder indictment. 4. Said William Dennett and certain members of the said Kennedy family testified at the trial of said indictment, all were called by the Commonwealth as witnesses, and all testified to facts which were substantially adverse to the interests of the defendant. 5. I find that Mr. Inker, at all times material to his representation of the defendant, was unaware that the firm of Crane, Inker and Oteri or any of its members or associates were acting as attorneys or had ever acted as attorneys for any of the witnesses who testified at the trial of this indictment. 6. I find that Mr. Inker was not affected in his judgment or conduct in his representation of Mr. Geraway by the legal representation of the said witnesses by other attorneys in the said law firm. 7. No credible evidence appeared before me that any attorney associated with the firm of Crane, Inker and Oteri ever informed Mr. Inker of the firm's representation of the said witnesses, and no credible evidence appeared before me that any attorney associated with the said law firm and who was aware of the firm's representation of said witnesses ever influenced or attempted to influence the judgment or conduct of Mr. Inker in the defense of the indictment. I find that Mr. Inker was not informed by anyone of the firm's representation of the witnesses, and I find that no such member or associate

appeal under the provisions of G. L. c. 278, §§ 33A-33H.

We summarized the factual framework of the trial in our opinion cited above. In essence, the case against the defendant consisted of certain eyewitness testimony given by two persons who identified him as a man they had seen in a yellow car near the site where the victim's body was discovered on the day of the murder, and the testimony of six other witnesses to admissions by the defendant that he had perpetrated it. It appeared at the hearing on the motion that four of these latter witnesses, and members of their immediate families, were represented, or had been represented, in various civil and criminal matters by the firm of Crane, Inker & Oteri. These witnesses were Carol Davies (sometimes referred to as Miss Kennedy), the defendant's ex-wife; her brother, Edward Kennedy; her sister, Michelle LeClair; and one William Dennett, a friend of the defendant.

The relationships between several members of this firm, the defendant, and certain witnesses at his trial can be summarized as follows. On May 9, 1967, Mr. Oteri, a member of the firm, wrote to the defendant, then incarcerated in Indiana, notifying him of one murder indictment against him, and the possibility of another, and suggesting a meeting "in order that we can prepare to defend against this charge."[2] Two days later Mr. Oteri again wrote to the defendant and indicated that he had asked Mr. Inker of his firm to be counsel "with me functioning as his associated counsel," and instructed the defendant to ask the Chief Justice of the Superior Court to appoint Mr. Inker as counsel. Mr. Oteri noted, "We are prepared to represent you through the trial,

of the firm ever influenced Mr. Inker or attempted to influence Mr. Inker in his conduct of the Geraway defense. 8. I find that Mr. Inker's legal representation of Mr. Geraway in the preparation for trial and the trial of this indictment was competent and skillful. 9. I find that Mr. Geraway was found guilty at the trial of this indictment by a jury which had heard a great weight of clear and convincing evidence of his guilt. 10. It is ORDERED that the within motion for a new trial is denied."

[2]The extent of Mr. Oteri's prior professional relationship with the defendant was unspecified, although the defendant suggested it began in May of 1966, two to three weeks after the murder of Sidlauskas, when the wife of William Dennett retained Mr. Oteri to represent the defendant on an unrelated charge. It is quite apparent from Mr. Oteri's testimony, and from the fact that his letter indicated that it was a response to one from the defendant, that he and the defendant had been acquainted with each other for some time prior to this.

and any subsequent appeal . . . even though you have no money.''[3] Mr. Inker was thereafter appointed counsel and represented the defendant at his trial and through his subsequent appeal.

Mr. Oteri testified that ''I had William Dennett a number of times on various criminal charges in Massachusetts and he would call me at times when he would be arrested outside of Massachusetts and I would attempt to counsel him as to what he should do.'' His representation of Dennett included at least one case in May, 1966, shortly after the Sidlauskas murder. Although Mr. Oteri testified initially that ''I don't have any memory of ever talking to Dennett after he went to Michigan and became involved with the district attorney's office in certain testimony that I think he gave against Mr. Geraway,'' he later testified that he did remember talking to Dennett in Michigan and consulting with him about a case in that jurisdiction involving checks. In a communication to Boston police Lt. Ingenere on March 14, 1967, Dennett referred to Mr. Oteri as his counsel.

Carol Davies, the defendant's ex-wife, testified that in March, 1967, she and her sister, Michelle LeClair, and her mother were questioned by Lt. Ingenere about the two murder cases involving the defendant and that she first told the lieutenant she knew nothing. The questioning by the lieutenant continued for about a week. During that period Carol Davies called Mr. Oteri ''a few times'' to ask his advice about the questioning and was advised by him to tell the lieutenant what she knew. Thereafter she told Lt. Ingenere that the defendant had made certain statements about the Sidlauskas murder, and she testified to that effect at the defendant's trial.

Michelle LeClair also gave evidence of questioning by Lt. Ingenere, and further said that she engaged in a discussion with her sister Carol as to whether she should answer his questions, that she was with Carol when she called Mr. Oteri,

[3]Mr. Oteri could not represent the defendant as his counsel as he was a member of the bar for less than ten years and hence, not eligible for appointment as his counsel. See Rule 95 of the Superior Court (1954).

and that when they saw Mr. Oteri in the court house he advised her to tell what they knew. She testified that prior to getting advice from Mr. Oteri to testify she had not told Lt. Ingenere anything, and that her decision to answer his questions was at least partially influenced by Mr. Oteri's advice.

Edward Kennedy, a brother of Carol and Michelle, gave evidence that he also was questioned by Lt. Ingenere about the defendant's involvement in a murder case about March, 1967. Mr. John P. White, Jr., of the firm of Crane, Inker & Oteri represented him on the first day of the interrogation. Later in that week Edward Kennedy consulted Mr. Oteri. Before talking with Mr. Oteri, Kennedy told Lt. Ingenere that he did not know anything about the subject of the interrogation. Later he said that the defendant had said something relative to the murder. He also testified that the police at the interrogation suggested they might involve him in a current armed robbery investigation, and that at the time of the defendant's trial armed robbery charges were in fact pending against Kennedy. He was subsequently acquitted on these charges. At the hearing on the motion, Edward Kennedy testified that what he ultimately told Lt. Ingenere concerning the defendant's statement that "I whacked a guy" was untrue.

In addition to counseling these witnesses, the firm of Crane, Inker & Oteri represented various members of their immediate family during the time it was representing the defendant. The firm represented Dennett's child and wife (as guardian and next friend) in a tort case which began about 1965 and was not finally disposed of until April 8, 1968. A judgment for $4,500 was eventually entered on a case in which the ad damnum was $250,000.

Beginning in January, 1967, the firm represented Russell Kennedy, the brother of Carol Davies, Edward and Bernard Kennedy, and Michelle LeClair on a homicide charge. This case was disposed of in June of 1967, but the firm continued rendering services relative to it until the summer of 1968. According to statements made by both Mr. Oteri and Edward Kennedy, the whole Kennedy family was involved in retain-

ing Mr. Oteri and discussing various matters with him and attempting to raise money for a fee in conjunction with the charge against Russell Kennedy. According to the testimony of Edward Kennedy, this fee was to consist of a payment of $500 to $800, plus an agreement to retain the firm for any civil cases which the family might have.

The firm also represented Bernard Kennedy on an assault and battery charge in April, 1967.

In that same month the firm represented Edward Kennedy and his wife Maureen in a tort suit on behalf of their son Stephen, a case which was settled in 1970 on the payment of certain sums. The firm handled another tort suit involving Sheila, another child of Edward and Maureen Kennedy, in 1968, and on this case money was recovered in December, 1969.

It would thus appear from virtually undisputed testimony that Mr. Oteri, as well as other members of the firm, was closely associated with William Dennett at least through the time of the police investigation of the Sidlauskas murder, and served as counsel for many members of the Kennedy family in both civil and criminal matters around the time of the defendant's trial.[4] Since it appears there was a significant possibility suggested by the evidence that Dennett in fact committed the murder, that various members of the Kennedy clan were in serious trouble with the police during this period, and that the firm was handling several tort cases for close relatives of the witnesses, the situation was replete with potential constraints, both ethical and economic, on the firm's representation of the defendant.

The questions raised by the foregoing recitation are made even more acute in that the defendant himself repeatedly questioned the firm's interest in representing him. He wrote to Mr. Oteri more than a few times asking why the firm wanted to represent him since he had no money to pay them. To his repeated questions he received no written response.

[4]Mr. Inker himself testified that Dennett told him, when being interviewed by Mr. Inker prior to the defendant's trial, that Mr. Oteri had "helped his kid." Furthermore, Mr. Oteri testified that he probably discussed the possibility of a conflict of interest with Mr. Inker, as well as other aspects of the case.

He also specifically inquired whether the firm was representing Dennett and therefore would not be able to give him its undivided loyalty. Mr. Inker finally replied specifically in a one line letter: "We never heard of Billie Dennett." However, there was a file maintained for Dennett in the firm and his name was apparently in the firm's card index of clients.

We accept the findings of the trial judge as true. Thus, although the firm considered as a single entity was involved in a serious conflict of interest, Mr. Inker's lack of knowledge of that conflict (finding No. 5) and the competence and vigor with which he conducted the defence (finding No. 8) indicate, as does our independent examination of the trial transcript, that there was slight, if any, possibility of prejudice to Geraway. Although there is doubt whether Federal constitutional principles require that a new trial be granted where a nonprejudicial conflict exists, see *Glasser* v. *United States,* 315 U. S. 60 (1942); *Hayman* v. *United States,* 205 F. 2d 891 (9th Cir. 1953); *Lollar* v. *United States,* 376 F. 2d 243 (D. C. Cir. 1967); *Zurita* v. *United States,* 410 F. 2d 477 (7th Cir. 1969); *United States ex rel. Williamson* v. *LaVallee,* 282 F. Supp. 968 (E. D. N. Y. 1968), and no State constitutional claim has been argued to us, the requirements of justice would be best served by ordering a new trial under our power set forth in G. L. c. 278, § 33E. The web of circumstances and overlapping relationships here, highlighted by Geraway's insistent inquiries about the possibility of a conflict, go far beyond cases of simple dual representation as, for example, *Commonwealth* v. *Smith,* 362 Mass. 782.

The defendant was entitled to the undivided loyalty of counsel as defined in the new American Bar Association Code of Professional Responsibility and Canons of Judicial Ethics, Ethical Consideration (EC) 5-14: "Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have *differing* interests, *whether such interests be conflicting, inconsis-*

*tent, diverse, or otherwise discordant"* (emphasis supplied). At the very least, if there exists even the possibility of a conflict of interest a lawyer is under an obligation to reveal it to his client. DR 5-105(C). See A. B. A. Standards Relating to The Prosecution Function and The Defense Function. § 3.5, p. 211. In this case not only was Mr. Inker a partner of the firm that represented four of the six witnesses to the defendant's alleged admissions but, when questioned about a possible conflict by the defendant, he flatly and specifically denied the existence of the relationship as to one of them.

It is conceivable that the foregoing facts were produced by utterly inadequate office management; it is tragic that any such inadequacy serves to produce the result of this opinion, causing as it will additional heavy expense to the county in which an otherwise faultless trial was held in which there was strong evidence of the defendant's guilt. The situation serves to point up the necessity of the institution by counsel of adequate checking arrangements to prevent a situation similar to that which obtained here.

As was stated in *Commonwealth* v. *Cox,* 327 Mass. 609, 614 (1951), which also involved a trial free from error, G. L. c. 278, § 33E, "consigns the facts as well as the law to our consideration, gives us the power and the duty exercised by a trial judge upon a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice." We conclude that in this case such a miscarriage occurred.

Following our opinion in *Commonwealth* v. *Geraway,* 355 Mass. 433, a rescript affirming the judgment below was docketed in the office of the clerk of the Superior Court for Norfolk County on March 10, 1969. General Laws c. 278, § 33E, states in part: "[I]f any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court." It is apparent, however, that what is now before us was not before us when we carried

out a review under c. 278, § 33E, and decided *Commonwealth* v. *Geraway, supra.* We thus have not had the opportunity to engage in a complete review under that section and no good purpose would therefore be accomplished by a remand to the single justice under § 33E.

In view of the foregoing we are of opinion that this is an appropriate occasion for the exercise of our power to order a new trial for reasons required by justice. The rescript is withdrawn, the judgment is reversed, the verdict is set aside, and the case is to stand for further proceedings on the indictment.

*So ordered.*

TAURO, C.J., and BRAUCHER, J., dissenting. We do not agree that "a serious conflict of interest," in the words of the majority, was shown by evidence, as required by *Commonwealth* v. *Smith,* 362 Mass. 782, 784 (1973). In our view any "potential constraints" on the representation of the defendant by his counsel rest in speculation and conjecture. The findings of the trial judge, accepted as true by the majority, show that counsel was not in fact "affected in his judgment or conduct" in his representation of the defendant, that his representation of the defendant was "competent and skillful," and that the defendant was found guilty "by a jury which had heard a great weight of clear and convincing evidence of his guilt." Justice therefore does not require a new trial, and the result of the majority opinion by three justices (two of the seven justices having disqualified themselves), which we agree is "tragic," is an unwarranted application of G. L. c. 278, § 33E. We would not disturb the conviction.

This appeal was argued to us primarily on the basis that the defendant was denied his constitutional right to the effective assistance of counsel. The decision of the trial judge on that issue was reviewable on appeal. *Earl* v. *Commonwealth,* 356 Mass. 181, 184 (1969). Compare *Commonwealth* v. *Underwood,* 358 Mass. 506, 510-512 (1970). The majority opinion does not clearly dispose of that issue. We think that the issue should be decided, and that there was no

such denial. On the basis of the record, which we have reviewed in its entirety, and the detailed findings by the judge, this conclusion is inescapable.

1. Where an attorney represents interests that conflict with those of the defendant, it is clear that the defendant has been denied the effective assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments to the United States Constitution. *Glasser* v. *United States,* 315 U. S. 60, 75-76 (1942). Assuming without deciding that the knowledge of Mr. Inker's law firm associates can be imputed to Mr. Inker,[1] we are confronted with a situation where the defendant is represented by an attorney who simultaneously is representing some of the prosecution witnesses in *unrelated* civil matters and who has represented in the past some of the prosecution witnesses in unrelated criminal matters. We cannot accept the defendant's contention that such a fact situation automatically presents a conflict of interest on his counsel's part.

Both State and Federal courts have agreed that such dual representation by defence counsel may be perfectly proper. "One attorney can certainly represent clients, all of whom know each other, *in unrelated matters* and still render adequate professional service to all. . . . An attorney can represent or know all the culprits and still render effective representation" (emphasis added). *Wirth* v. *United States,* 348

---

[1] Most courts will impute the knowledge of one member of a law firm to all its members for purposes of disqualification. See *Laskey Bros. of W. Va. Inc.* v. *Warner Bros. Pictures, Inc.* 224 F. 2d 824 (2d Cir. 1935). "The premise upon which disqualification of law partners is based is that there is within the law partnership a free flow of information, so that knowledge of one member of the firm is knowledge to all." *People* v. *Wilkins,* 28 N. Y. 2d 53, 56 (1971). Relying on this rule, the defendant argues that it is irrelevant that his attorney never *personally* represented the prosecution witnesses because the knowledge of his attorney's law firm associates who did represent prosecution witnesses is imputed to his attorney, a member of the same firm.

However, imputation of knowledge for purpose of disqualification is based on a presumption of a free information flow between associates of the same firm, a presumption which can be rebutted by evidence in a specific case that there was *in fact* no free flow of information between law firm members. See *People* v. *Wilkins, supra,* 56-57. In such cases where the presumption of free flow of information is rebutted by evidence to the contrary in the record, no conflict of interest will be found "[a]bsent a showing that the particular staff attorney [or particular member of a law firm] who defended the defendant knew of a potential conflict and was inhibited or restrained thereby during trial." *People* v. *Wilkins, supra,* at 57.

F. Supp. 1137, 1141 (D. Conn. 1972). See *Olshen* v. *McMann,* 378 F. 2d 993 (2d Cir. 1967), cert. den. 389 U. S. 874 (1967). The mere fact of dual representation standing alone does not create a Sixth Amendment violation. A conflict of interest must first be established. *Lugo* v. *United States,* 350 F. 2d 858 (9th Cir. 1965). *United States* v. *Burkeen,* 355 F. 2d 241 (6th Cir. 1966), cert. den. sub nom. *Matlock* v. *United States,* 384 U. S. 957 (1966). As we noted recently in *Commonwealth* v. *Smith, supra,* "[a] conflict of interest such as to deny to a defendant the effective assistance of counsel must be shown by evidence." 362 Mass. at 784 (1973). See *United States* v. *Lovano,* 420 F. 2d 769, 773 (2d Cir. 1970); *Layne* v. *United States,* 312 F. Supp. 140 (S. D. N. Y. 1970); *People* v. *Wilkins, supra,* at 56. All of these decisions require a clear showing of an actual conflict of interest which places the defence attorney in a position where his loyalties to one client will impinge upon his commitment to another. (See Canon 6 of the American Bar Association Canons of Professional Ethics: ". . . a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.") Therefore, we must examine the types of dual representation that occurred at the defendant's trial in order to determine whether there is any evidence in the record to support Geraway's claim that his attorney (Mr. Inker) could not effectively defend him because of conflicting loyalties.

(a) Mr. Inker (treating Mr. Inker and firm members as one) was *simultaneously* representing some of the prosecution witnesses (the Kennedys) in *unrelated civil matters.* Since this aspect of Mr. Inker's dual representation was simultaneous with his defence of Geraway, Mr. Inker owed an ongoing duty of individual loyalty to both Geraway and the Kennedys. However, there is nothing in the record to suggest that the Kennedys' interests in *completely unrelated* civil tort suits conflicted with Geraway's interests in defending himself against the Commonwealth's criminal charge. The only possible contention of conflicting loyalties on Mr.

Inker's part is based on mere conjecture and speculation that Mr. Inker would be inhibited in his cross-examination of the Kennedys because he would not want to lose them as clients in potentially lucrative but unrelated civil tort suits. Such speculation is not sufficient proof of an actual conflict of interest (see *Commonwealth* v. *Smith, supra,* at 784 [1973], especially where a careful examination of the trial transcript reveals that Mr. Inker vigorously cross-examined the Kennedys when they testified at Geraway's trial.[2]

(b) The more serious allegation of a conflict is based on the fact that Mr. Inker (or members of his firm) had represented a prosecution witness (Dennett) in *unrelated* criminal cases *in the past.* The potential conflict of interest that may arise in this situation was described by Judge Waterman in *Olshen* v. *McMann,* 378 F. 2d 993, 994 (2d Cir. 1967): "Unlike the situation in *Glasser* v. *United States,* 315 U. S. 60 . . . appellant's counsel here did not simultaneously represent at trial codefendants with competing interests. Nor was a con-

---

[2]The defendant's brief protests that Mr. Inker did not produce Miss Kennedy's (formerly Geraway's wife) criminal record and that he did not explore her possible motives for testifying for the prosecution or for distorting or fabricating her testimony. It is doubtful whether the introduction of Miss Kennedy's criminal record would have more fully impeached her credibility than the numerous admissions that she made while on the stand which tended to cast suspicion upon her version of the events. Contrary to the defendant's view, Mr. Inker explored in detail Miss Kennedy's motives for testifying against Geraway.

On direct examination, Miss Kennedy testified that she went to Chestnut Hill with Geraway when he rented a yellow Ford Falcon automobile. Later Geraway told her that he had "killed a guy" because he thought the man was William Dennett's wife's boyfriend. After the murder, Geraway stayed at Miss Kennedy's apartment because he was fearful that he would be identified by eyewitnesses who had seen him in the vicinity of the murder.

On cross-examination, Miss Kennedy admitted that she had divorced Geraway after two years of marriage and that he was not the greatest husband. He had hit her on one occasion and had been cruel to her because her daughter was not his child, although he knew she had the child before they were married. Miss Kennedy had continued to see the defendant since their divorce though he often bothered her and was a pest. She indicated that Geraway was a liar and a teller of fanciful tales and that she seldom believed what he said. As a result of such testimony Miss Kennedy was presented to the jury as someone who might well harbor deep seated grievances against the defendant and might have a strong motive for wishing him convicted.

Mr. Inker also elicited her admission that for about ten days after the killing she had repeatedly told Lt. Ingenere that she knew nothing about the shooting. Although she had read that another man (Jackman) had been indicted and tried for this murder, she did not volunteer any information about Geraway to the police. She had, in fact, written to Geraway telling him to stop the police from questioning her and stating that she knew nothing of the events. Finally, Mr. Inker examined discrepancies in her testimony before the Norfolk County grand jury, her statement to Lt. Ingenere and her present testimony.

flict of interest created here, as in *United States* v. *Hayman,* 342 U. S. 205 . . . through counsel's simultaneous representation of an accused standing trial and a principal witness for the prosecution who had been convicted on a related charge and was awaiting sentence thereon. Where, as here, the possible conflict arises from a *prior* representation of a prosecution witness, the primary, if not the only, factor which might deter counsel from staging an effective defense would be his reluctance to divulge or to make use of the knowledge derived from the confidential communications of his former client.''

Thus, we are faced with a potential conflict similar to the one alleged in *Commonwealth* v. *Smith,* 362 Mass. 782 (1973). In that case, Smith alleged that his attorney's ability to give him effective assistance of counsel was impaired by a conflict of interest arising from the fact that Smith's attorney had represented the prosecution's chief witness (Reed) on an unrelated criminal proceeding five days before Smith's trial commenced. The nature of the dual representation in the *Smith* case presents a far more compelling possibility of conflicting interests than in the instant case, yet no conflict was found.

Smith and Reed were both arrested for a heroin transaction which occurred on December 26, 1969. Reed pleaded guilty and received a suspended sentence. Smith was represented on this charge by a Mr. Crowley commencing February 10, 1970, and continuing through Smith's trial. Before Smith's trial, Reed was arrested again for unlawful possession of heroin. On June 11, 1970, the court appointed Smith's attorney (Mr. Crowley) to represent Reed on this new offence. Reed was tried, convicted, and sentenced on June 11, 1970. On June 15, Reed withdrew an appeal from his conviction. On June 16, 1970, Smith went to trial and Reed appeared as the prosecution's chief witness. In denying Smith's claim that he did not receive effective assistance of counsel, we noted that, since Mr. Crowley's representation of the Commonwealth's witness had ended with Reed's sentencing prior to Smith's trial, there was no fear that Smith's

attorney would be hindered in cross-examining Reed because of Smith's attorney's desire to reduce the witness's (and his client's) chance for a favorable sentence. See *United States* v. *Hayman,* 342 U. S. 205 (1952); *Unites States ex rel. Platts* v. *Myers,* 253 F. Supp. 23 (E. D. Pa. 1966); *People* v. *Ware,* 39 Ill. 2d 66 (1968); *State* v. *Ebinger,* 97 N. J. Super. 23 (1967).

Thus, the only potential source of a conflict was the possibility that Smith's attorney had been given confidential information by Reed which served to restrict Mr. Crowley's cross-examination of Reed. See *Olshen* v. *McMann,* 378 F. 2d 993 (2d Cir. 1967). We noted in the *Smith* case that no showing of such a problem had been made and that its possibility "was extremely unlikely" because Reed's defence "concerned an event which had no connection with Reed's alleged transaction with Smith on December 26, 1969." After reviewing the trial transcript and the evidence at the hearing on the motion for a new trial, we concluded that Smith's contention that his attorney "was inhibited in his cross-examination of Reed, because of confidential communications by Reed or for any other reason, is no more than speculation. A conflict of interest such as to deny a defendant the effective assistance of counsel must be shown by evidence." 362 Mass. at 784 (1973).

Our holding in the *Smith* case is dispositive of the problem before us in the instant case. As in the *Smith* case, Geraway's counsel had represented one prosecution witness (Dennett) in *prior unrelated* criminal matters which had no connection or bearing on the charges against Geraway.[3] Thus, there is no reason to infer that Mr. Inker received *any* confidential communications from Dennett which would have restricted his cross-examination of Dennett when he testified at Geraway's trial. To the contrary, our review of the trial transcript indicates that Mr. Inker vigorously attacked Dennett's cred-

---

[3]The fact that other members of Mr. Inker's firm (e.g. Mr. Oteri and Mr. White) advised some of the prosecution witnesses to answer truthfully all questions asked them by the police and grand jury during the State's investigation of the Sidlauskas killing does not *by itself* constitute sufficient evidence of a type of dual representation which suggests a conflict of interest on Mr. Inker's part. See *Wirth* v. *United States,* 348 F. Supp. 1137, 1141 (D. Conn. 1972).

ibility on cross-examination.[4] Moreover, this is not a situation like that in the *Smith* case where the prosecution witness's testimony could have resulted from an agreement between the witness and the prosecutor in which the defendant's counsel participated.

Thus, no conflict of interest existed in the instant case. As in the *Smith* case, *supra,* the defendant's contention that his attorney was inhibited in his cross-examination of prosecution witnesses because of confidential communications, divided loyalties, or for any other reason is no more than unsubstantiated speculation. Our conclusion that no actual conflict of interest existed during Geraway's trial is supported by State and Federal cases where similar types of dual representations by defence counsel were involved. See *Hayman* v. *United States,* 205 F. 2d 891 (9th Cir. 1953), cert. den. 346 U. S. 860 (1953); *Weaver* v. *United States,* 263 F. 2d 577 (8th Cir. 1959); *Olshen* v. *McMann,* 378 F. 2d 993, 994 (2d Cir. 1967), cert. den. 389 U. S. 874 (1967); *Harrison* v. *United States,* 387 F. 2d 614 (5th Cir. 1968); *United States* v. *Alberti,* 470 F. 2d 878 (2d Cir. 1972), cert. den. sub nom. *Alberti* v. *United States,* 411 U. S. 919 (1973); *United States ex rel. Kachinski* v. *Cavell,* 311 F. Supp. 827, 829 (M. D. Pa. 1969), affd. 453 F. 2d 581 (3d Cir. 1971); *Wirth* v. *United States,* 348 F Supp. 1137 (D. Conn. 1972);[5] *Montgomery* v. *Maryland,* 15 Md. App. 7 (1971); *People* v. *Wilkins,* 28 N. Y. 2d 53 (1971).

---

[4]The defendant's brief argues that Dennett's extensive record of criminal convictions should have been introduced and that his motives for testifying against Geraway should have been examined in greater detail. In light of the plethora of admissions of criminal activity by Dennett, formal introduction of his record of criminal convictions was not necessary. Moreover, Mr. Inker did in fact prove Dennett's motives for testifying against Geraway in great detail. Dennett admitted that he once expressed a desire to kill Geraway to prevent Geraway from testifying against him concerning a bad check charge. Dennett stated during his cross-examination that he no longer wished to kill Geraway because by testifying against him he was accomplishing his wish in another way. Tangentially, Mr. Inker also touched upon the possibility that Dennett himself had committed the murder. Mr. Inker elicited from Dennett an admission that Dennett was near the scene of the crime on the night of the murder and that he had been firing a .38 caliber gun for target practice. The fatal shot was fired from a .45 caliber gun.

[5]The *Wirth* case involved allegations bearing a striking resemblance to the allegations of prejudice Geraway makes in the instant case. Both Wirth and Geraway claimed their counsel prevented them from taking the stand and from placing responsibility for the crime on one of the prosecution witnesses. The court's

Finally, it should be noted that in all those cases where courts have found that defence counsel's prior representation of prosecution witnesses in "unrelated" civil or criminal cases has resulted in a conflict of interest, there were *special circumstances,* such as the prosecution witness being the victim of the crime for which the defendant was charged, that indicated that the prior cases involving defence counsel *were not in fact* unrelated to the defendant's criminal trial. See *Zurita* v. *United States,* 410 F. 2d 477 (7th Cir. 1969); *United States ex rel. Miller* v. *Myers,* 253 F. Supp. 55 (E. D. Pa. 1966); *People* v. *Stoval,* 40 Ill. 2d 109 (1968).

The other cases the defendant relies on where conflicts were found involved situations, unlike that in the present case, where the defence attorney's representation of one who consented to be a government witness had not ended because the witness testified prior to his own sentencing. See *United States* v. *Hayman,* 342 U. S. 205 (1952); *United States ex rel. Platts* v. *Myers,* 253 F. Supp. 23 (E. D. Pa. 1966); *United States ex rel. Williamson* v. *LaVallee,* 282 F. Supp. 968 (E. D. N. Y. 1968); *People* v. *Ware,* 39 Ill. 2d 66 (1968); *State* v. *Ebinger,* 97 N. J. Super 23 (1967).

2. "Since we have found that no conflict of interest exists, we have no reason to decide whether, a conflict having been proven, prejudice must be shown." *Commonwealth* v. *Smith, supra,* at 784 (1973). However, our review of the record leads us to conclude that the defendant enjoyed the services of a thorough and competent attorney who vigorously represented the interests of his client.[6] There is no evidence that the defendant was prejudiced by the fact that some of Mr. Inker's associates represented some of the prosecution witnesses in unrelated matters.

---

response to these contentions in the *Wirth* case is equally applicable to Geraway's allegations. "Unfortunately, trial tactics originally conceived as the best defense in 'the bright glare of hindsight' prove to be a mistake but such does not mean that. counsel was inadequate." P. 1142. It may be of some significance to note that Geraway refused to waive his attorney-client privilege so as to permit Mr. Inker to testify about his conversations with Geraway.

[6] At the end of his trial, Geraway made an unsworn statement to the jury in which he praised Mr. Inker and stated he could never sufficiently express his gratitude for the tremendous amount of work that Mr. Inker had put into his defence.

3. The majority opinion does not squarely rule on the constitutional claim argued to us. Instead, it rests on the power of this court under G. L. c. 278, § 33E, to order a new trial "for any other reason that justice may require." Although the record in this case has been reviewed once before by this court under § 33E, we do not object to the decision that remand to a single justice of this court is not required where it would accomplish "no good purpose." But we do think that the power to award a new trial under § 33E, like the "rarely used power" exercised in *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967), should be used with greater restraint than is shown here. See *Commonwealth* v. *Concepcion,* 362 Mass. 653, 654 (1972); *Commonwealth* v. *Richards,* 363 Mass. 299, 310 (1973).

Our power to award a new trial without regard to technical rules of law should be exercised with primary focus on ultimate justice in the particular case. This means to us that we must concern ourselves primarily with the particular defendant and the particular facts, and hence that we must place primary reliance on the trial judge who has seen and heard the evidence of the live witnesses and the oral contributions of counsel. If there is an aroma of unfairness in the trial, it can be detected far more reliably by the trial judge than by appellate judges reading between the lines of a stale transcript. It is for this reason, we believe, that the trial judge has the unreviewable power to award a new trial, and that we have traditionally been very reluctant to order a new trial when the trial judge has refused to do so.

In this case, we must face the findings of the trial judge: "Mr. Inker, at all times material . . . was unaware" that members of his firm "had ever acted as attorneys for any of the witnesses . . .." He "was not affected in his judgment or conduct . . . by the legal representation" of the witnesses by attorneys in his firm. His "legal representation of Mr. Geraway in the preparation for trial and the trial of this indictment was competent and skillful. . . . Mr. Geraway was found guilty at the trial of this indictment by a jury which had heard a great weight of clear and convincing evi-

dence of his guilt.''

The majority of three ''accept . . . as true'' these detailed findings made by the judge after hearing sworn testimony on the motion for a new trial. These findings completely and effectively negate all allegations (a) that there was impropriety on the part of counsel; (b) that the defendant was not effectively represented by competent counsel; (c) that the defendant was prejudiced in any way; and (d) that the defendant did not receive a fair trial. On the basis of the record it was virtually impossible for the majority to conclude that the judge had abused his discretion in denying a motion for a new trial. Of course, the majority do not so base their decision.

Rather, with obvious disregard of facts established by the record and the judge's findings, the majority decide to grant a new trial under the extraordinary powers of the court as provided in G. L. c. 278, § 33E, concluding that even though the trial was free from error a ''miscarriage of justice'' occurred. The majority thus, in utter disregard of the exact and detailed findings of the judge based on sworn testimony (after accepting them as true), grant a new trial on the basis of illusive, irrational and self-serving allegations of a convicted defendant who is struggling to escape the consequences of his crime after a fair trial and a review by the court. We state most emphatically that the ''requirements of justice would [not] be best served'' by such a decision.

The majority opinion, on the basis of ''potential constraints,'' the ''web of circumstances and overlapping relationships here,'' and the defendant's ''insistent inquiries about the possibility of a conflict,'' uses this case as a vehicle to convey a message to the bar as to ''the necessity of the institution by counsel of adequate checking arrangements.'' We do not deny that rules of law may sometimes properly serve such a prophylactic purpose, although even in deciding issues of law we should never lose sight of the ultimate purpose to acquit the innocent and convict the guilty. But in exercising a power to do justice without regard to technical rules of law, we should be especially careful to avoid sacri-

ficing justice in order to vindicate some abstract lawyer's point.

In any event, the majority opinion chooses means which do not fit the end. To teach lawyers a lesson in office management, guilty defendants are offered a second chance to escape justice. But the "inadequate office management" was that of a lawyer requested by the defendant. The lesson is to be driven home by awarding a victory to the defendant and his offending lawyer. There is nothing to indicate that the prosecutor or the judge had any part in the offence, but their efforts suffer defeat and frustration, and the public, as usual, sustains the greatest loss. We do not believe that § 33E was ever intended to be used in such circumstances.

4. Unfortunately, the decision of three justices has effectively disposed of the instant case. However, we voice grave doubts whether the power of the court under G. L. c. 278, §33E, should be exercised without a vote of a majority of all seven justices. Decision without such a vote (as in this case) could lead to consequences not wholly consistent with the requirements of justice.