UNITED STATES ex rel. John F. WILLIAMSON, Petitioner,

v.

J. Edwin LaVALLEE (now Daniel McMann), Warden of Auburn State Prison, Auburn, New York, Respondent.

No. 67–C–1146.

United States District Court
E. D. New York.

April 17, 1968.

Anthony F. Marra, the Legal Aid Society, New York City, for petitioner; Simon Chrein, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of New York, for respondent; Hillel Hoffman, Asst. Atty. Gen., Michael Colodner, Deputy Asst. Atty. Gen., of counsel.

ZAVATT, Chief Judge.

 This is an application for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241, 2242. Petitioner was convicted by a jury in the County Court, Suffolk County, on two counts of selling and two counts of possessing narcotic drugs. He was sentenced to concurrent terms of five to seven and one-half years on the convictions for selling narcotics and given a suspended sentence on the convictions for possession. When this application was originally filed in the United States District Court for the Northern District of New York, the petitioner was incarcerated in Auburn State Prison. Since that time the court has been advised that he has been paroled. It is settled that one who has been released on parole may seek habeas corpus relief, because he is "in custody" within the meaning of 28 U.S.C. § 2241. Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). Under New York law, however, although petitioner has been released on parole, he remains "in the legal custody of the warden of the prison from which he is paroled, until the expiration of the maximum term specified in his sentence," New York Correction Law, McKinney's Consol. Laws, c. 43, § 213, because he was sentenced prior to the effective date of the recodified New York Penal Law, McKinney's Consol.Laws, c. 40, enacted by L. 1965, c. 1030, effective September 1, 1967.

Those sentenced subsequent to the recodified Penal Law, and thereafter paroled, are in the custody of the New York Board of Parole. New York Correction Law § 805, subd. 6, effective September 1, 1967. Therefore, there is no necessity to add or substitute members of the Parole Board as parties to this proceeding, as was necessary in Jones v. Cunningham, supra. See United States ex rel. Sadness v. Wilkins, 312 F.2d 559 (2d Cir.), cert. denied, 374 U.S. 849, 83 S.Ct. 1910, 10 L.Ed.2d 1069 (1963). Since the filing of the petition herein, Daniel McMann has become the Warden of Auburn State Prison. This fact has been noted by the court in the caption hereof.

Petitioner seeks to invalidate his State conviction upon the ground that he was denied the effective assistance of counsel guaranteed to him by the Sixth Amendment to the Constitution of the United States in that his attorney simultaneously represented an important witness for the prosecution.[1] Judge Port found that petitioner had exhausted his State remedies as required by 28 U.S.C. § 2254 and also that an evidentiary hearing was necessary. Pursuant to 28 U.S.C. § 2241(d), the application was transferred to this court for hearing and determination. A hearing has been held, and as a result thereof, the application is granted.

*Petitioner's Trial*

The principal witness against the petitioner at the trial was R. S. Cantu, an agent for the Federal Bureau of Narcotics. Mr. Cantu testified that he was introduced to petitioner by one Rudy Cordova, a narcotics addict and "special employee" of the Bureau, at a bar in Wyandanch, Long Island; that Cordova inquired of petitioner whether he could obtain "junk" (narcotics) for Cantu; that petitioner left the bar and shortly thereafter returned with four packages of heroin which he sold to Cantu. Cantu

---

1. The application also alleges that his attorney simultaneously was representing one James Hunter, who during petitioner's trial allegedly confessed his guilt, and that his attorney failed to investigate this assertion after being informed of it by petitioner. In view of the disposition of the application on other grounds, this contention will not be considered.

also testified that on a date subsequent to this transaction, petitioner sold Cantu several marihuana cigarettes which had been concealed in the horn rim of his automobile. Other police officers corroborated some of the details of these transactions; i. e., that Cantu, Cordova and petitioner were together in the bar, that petitioner left the bar and returned a short while later, and that Cantu showed them "powder" subsequent to the purported sale. The officers also testified that, on another occasion, they saw petitioner hand currency to Cantu after taking something from the horn of his automobile. The only witness that corroborated Cantu's testimony that petitioner sold narcotics to Cantu, on the basis of personal observation of the passing of narcotics, was Cordova. Petitioner testified in his own defense, admitting that on the days in question he met Cantu and Cordova, but denying that he sold narcotics to Cantu.

*Petitioner's Attorney*

Petitioner was represented at his trial by one Edward LaFreniere. According to his testimony at the hearing on the instant petition, petitioner first met LaFreniere at the Suffolk County Jail shortly after his arrest. LaFreniere was "walking along taking everybody's name." Petitioner testified that LaFreniere announced, "If you need a lawyer * * * I am a lawyer," and, thereafter, he was retained by petitioner who paid him $300. Petitioner claims that he did not see his attorney from the day following his arrest until his appearance in court to stand trial. The only advice that he got from LaFreniere during that time was to waive a preliminary hearing. The testimony of LaFreniere seems to corroborate that of the petitioner. During cross-examination by the petitioner's attorney, at the hearing on this petition, the following colloquy occurred:

"Q: Now, Mr. LaFreniere, do you recall how much time you devoted to discussing Mr. Williamson's case with Mr. Williamson before the case went to trial?

A: I couldn't tell you.

Q: Could you tell us from your judgment practically how much time it might have been at the most?

A: Do you want me to shock you?

Q: Yes.

A: Well, when we started to pick the Jury. That's right. The Judge would call me up in the afternoon and say, 'We are going to start at 3:00,' or 'We will have a Jury come in at 1:00 o'clock.' He would tell me that that night. And that you've got to be ready the next morning."

LaFreniere also testified that if his clients wanted to talk with him prior to their trials "They would have to go up to the courthouse and catch me on the recess."

At the time of petitioner's trial (January 29–31, 1962), LaFreniere was also representing the aforementioned Rudy Cordova. Cordova was then under an indictment returned on August 21, 1961 by the Suffolk County Grand Jury for burglary, third degree, and petit larceny, such crimes allegedly occurring in the latter part of 1960. The alleged transactions with petitioner and Cantu occurred in July 1961. Although only a copy of the Cordova indictment is before the court, the minutes of petitioner's coram nobis hearing, held November 14, 1966, indicate that Cordova was permitted, upon recommendation of the District Attorney, to plead guilty to unlawful entry, a misdemeanor, on April 9, 1962, a few months after petitioner's trial, and was subsequently sentenced to time already served, approximately six months. That this is the case is not disputed by the Attorney General on this application.

Petitioner testified that he was acquainted with Cordova prior to the trial. Cordova had been a customer at a gas station operated by petitioner in 1960, but aside from the chance meetings in July 1961 petitioner claims he did not see Cordova until the trial. He claims that not until the trial did he learn that Cordova was being represented by LaFreniere. In view of the testimony of

both petitioner and LaFreniere regarding the extent of their pretrial discussions this claim is quite believable. In fact, LaFreniere himself testified that, until the trial began, he did not know Cordova would testify against petitioner.

Finally, it is of no little significance that some time after these events, LaFreniere was disbarred as an attorney by the Appellate Division, Second Department, for numerous activities which reflected his low standards of legal ethics. Suffolk County Bar Ass'n v. LaFreniere, 26 A.D.2d 946, 274 N.Y.S.2d 656 (2d Dep't 1966).

*Effective Assistance of Counsel*

It is well settled that a defendant is denied his constitutional right to the assistance of counsel if his attorney represents conflicting interests without his knowledge and assent. See, e. g., United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952); Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Dardi, 330 F.2d 316 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed. 2d 50 (1964); United States v. Bentvena, 319 F.2d 916 (2d Cir.), cert. denied, Galante v. United States, 375 U.S. 940, 84 S.Ct. 346, 11 L.Ed.2d 271 (1963). It is of no consequence that a defendant retained his attorney *voluntarily*, if, in fact, he had no knowledge of the conflict. Randazzo v. United States, 339 F.2d 79 (5th Cir. 1964); Porter v. United States, 298 F.2d 461 (5th Cir. 1962). In the instant case, petitioner did not learn of the conflict until during the trial, and may not be said to have assented to it by his silence. It is understandable that a criminal defendant, not necessarily familiar with all of his constitutional rights, and not informed of the same by the trial judge when the dual representation became apparent, might not interrupt his trial to request that his attorney be relieved even if he was made aware during the course of the trial that a prosecution witness was a client of his attorney. See Taylor v. United States, 96 U.S.App.D.C. 379, 226 F.2d 337 (1955), reversing 126 F.Supp.

764 (D.D.C.1954). Cf. Glasser v. United States, supra; Craig v. United States, 217 F.2d 355 (6th Cir. 1954).

It takes no great imagination to detect the potential dangers that faced the petitioner by being defended by an attorney who was also representing an important prosecution witness. Cordova, a known narcotics addict, had a felony indictment hanging over him at the time he testified against the petitioner. The possibility existed that Cordova thought that he could secure more favorable treatment from the District Attorney and from the courts if he cooperated with the State in the prosecution of another case. In fact, Cordova did subsequently plead to a reduced charge and did receive as his sentence time already served. If Cordova chose to lie, in order to gain for himself such favorable treatment, a vigorous cross-examination by petitioner's attorney would be the way to expose, for example, a possibly false identification of petitioner by the police officers. The knowledge that Cordova has a felony charge pending against him might have reduced LaFreniere's zeal in cross-examining him, one of his clients—favorable treatment for Cordova could not be expected if he were proven to be a liar. Even if LaFreniere were not himself involved in any deal to obtain Cordova's testimony, as an experienced criminal attorney he was surely aware that Cordova's subsequent treatment might depend on his performance at petitioner's trial. That Cordova might have fulfilled a bargain with the District Attorney is not an unreasonable inference to draw, and the existence of such an arrangement would establish a conflict of interest in LaFreniere between the petitioner and Cordova. A second danger in being represented by an attorney who is also representing a prosecution witness is that the scope of examination of the witness by the attorney might be restricted by the fact that the attorney has learned confidential information about his client-witness which cannot be revealed. Of course, in view of LaFreniere's quite limited consultation

with his clients prior to trial, this danger is substantially reduced.

In a case remarkably similar to the instant case, the Court of Appeals for the District of Columbia Circuit vacated the sentence of a federal prisoner after the district court had refused to grant relief. Taylor v. United States, supra. In *Taylor*, one Monroe was indicted for grand larceny and taken by his attorney to a United States Attorney. Monroe began working for the United States Attorney as an informer and as a result thereof purchased narcotics from Taylor. Taylor was subsequently indicted for this sale and was thereafter represented by the same attorney who was representing Monroe. The criminal case against Monroe was dismissed by the Government three weeks before Taylor's trial (but the attorney was still representing Monroe, in an unrelated civil matter, when he represented Taylor at his trial). At Taylor's trial Monroe testified against Taylor, at which time the fact of dual representation was made clear. In fact, Monroe was admittedly cross-examined vigorously with respect to contrary information he had previously given to the attorney who was representing Taylor and Monroe. Nonetheless, the Circuit Court granted the requested relief.[2]

The brief submitted by the Attorney General carefully reviews the trial record in an effort to establish that petitioner was not prejudiced by LaFreniere's dual representation, apparently to suggest that the defense conducted by LaFreniere was "as effective as it might have been" had there been no conflict. See Glasser v. United States, supra. It is true that LaFreniere made it clear to the court and jury that Cordova was an addict, that he had a criminal record, that he was then under indictment and being represented by LaFreniere, and that, therefore, his credibility was suspect. The argument is offered that it is proper in this type of case to search the record in order to discern whether petitioner was prejudiced, and that such a search here indicates that he was not, since LaFreniere did all that he could have done under the circumstances.

All the cases cited by the respondent do speak of the presence or absence of indications of prejudice on the record. However, in each of those cases the court was in fact searching the record in order to determine whether or not there existed a conflict of interest, not whether, given such a conflict, the defendant suffered any prejudice therefrom. Olshen v. McMann, 378 F.2d 993 (2d Cir. 1967), cert. denied, 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157;[3] United States v. Paz-Sierra, 367 F.2d 930 (2d Cir. 1966), cert. denied, 386 U.S. 935, 87 S.Ct. 962, 17 L.Ed. 2d 807 (1967);[4] Goodson v. Peyton, 351 F.2d 905 (4th Cir. 1965);[5] United States

---

**2.** The court (per curiam) cited no authority; it merely said that the defendant had been deprived of his right to the effective assistance of counsel. In a dissenting opinion, Judge Prettyman suggested, citing United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952), that the case be remanded to the district court for a hearing to determine whether Taylor knew at the time he employed counsel, that counsel also represented Monroe.

**3.** The record revealed that the prosecution's witness had already disclosed to the state police his participation in the crime with defendant, thereby waiving the attorney-client privilege. Therefore, that the attorney for the defendant was previously the witness' attorney created no conflict of interest; the attorney could freely cross-examine the witness without fear of breaching the attorney-client relationship. It should be noted that the attorney's representation of the witness had been concluded prior to defendant's trial, and therefore the attorney-client privilege was the only possible way in which a conflict of interest might arise.

**4.** Since both defendants were telling the same version of the incident in question, there were no inconsistencies in their defenses and hence no conflict of interest arose.

**5.** The defendant's attorney was a county prosecutor for another county in the State. However, the court found no conflict of interest since the charges against the defendant were simple (escape from jail), no questions regarding the applica-

v. Burkeen, 355 F.2d 241 (6th Cir.), cert. denied, 384 U.S. 957, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966);[6] Lollar v. United States, 126 U.S.App.D.C. 200, 376 F.2d 243 (1967).[7] In the instant case, there was most certainly a conflict between the interest of petitioner and that of Cordova. In any event, it cannot be said with certainty that petitioner suffered no prejudice. LaFreniere's cross-examination of Cordova begins ominously for the defendant (petitioner herein):

"Q: Do you know John Williamson?

A: Yes, I do.

Q: Do you know him a long time, don't you?

A: About two years.

Q: As a matter of fact, sometimes he even took you to New York to get some stuff for yourself?

A: No, he never took me to New York."

While LaFreniere did examine the witnesses with regard to Cordova's character and credibility, he offered no witnesses on petitioner's behalf other than the petitioner himself, and he conducted no examination of any witness concerning petitioner's version of the incidents in question. Admittedly it is speculative whether or not any such testimony was available, or whether or not it might have influenced the jury when weighed against the direct testimony of the police officers.

A recent case in the District Court for the Eastern District of Pennsylvania summed up the position that this court now takes, as follows:

"This situation is too fraught with the danger of prejudice, prejudice which the cold record might not indicate, that the mere existence of the conflict is sufficient to constitute a violation of relator's rights whether or not it in fact influences the attorney or the outcome of the case."

United States ex rel. Miller v. Myers, 253 F.Supp. 55, 57 (E.D.Pa.1966). In *Myers,* the defendant confessed to a burglary before he saw his attorney. Because of this confession the attorney advised the defendant to plead guilty; the attorney had hoped that cooperating with the State might help the defendant with regard to leniency as he was a second offender. The defendant did plead guilty. The defendant subsequently learned that his attorney had at the time also represented the victim of the burglary in an unrelated civil matter. The district court granted habeas corpus relief. It concluded that human nature was such that the civil clients might have been unhappy if the defendant were acquitted after a trial or if he received a light sentence. The court was aware that it was only speculating as to possible prejudice that the defendant might have suffered but, nonetheless, granted relief. Support for the proposition that all that need be present to establish a deprivation of a defendant's right to counsel is a genuine conflict of interest, and that a finding of specific prejudice resulting therefrom need not be made, may be found in United States

---

bility of State law were involved, and there was no occasion for inquiring into other criminal conduct of the defendant.

6. Both defendants, represented by a single attorney, were charged with bank robbery. There was no conflict of interest since the defenses of each were not inconsistent.

7. Codefendants were represented by a single attorney. The defenses of each were premised on their claims that the complainant had been engaging in homosexual acts with them. The court found

"possible prejudice" in repeated references to the appellant (Lollar) as "Miss Lollar" and "Miss Lolly" by the other defendant, and in counsel allowing Lollar to testify (one had to testify, but attorney called both, possibly seeking to appear even-handed in his treatment of both clients). The court said, "some prejudice, *some conflict of interest* * * * must exist before one can be said to have been denied effective assistance of counsel." 376 F.2d at 246. (Emphasis added.)

v. Gougis, 374 F.2d 758 (7th Cir. 1967); Whitaker v. Warden, Md. Penitentiary, 362 F.2d 838 (4th Cir. 1966); and Sawyer v. Brough, 358 F.2d 70 (4th Cir. 1966).

 In Glasser v. United States, supra, the Supreme Court looked to the record in order to conclude that the representation of the codefendants by a single attorney resulted in less effective representation than might have been afforded if appellant had his own attorney at the trial. The question of conflict of interest of necessity always arises in cases where a single attorney represents multiple defendants, and in such cases the court must, as it did in *Glasser*, search the record to determine whether there were occasions where the defenses of the defendants were in conflict or where trial strategy dictated by the circumstances of one defendant conflicted with proper strategy on behalf of another. The mere fact of dual representation, standing alone, does not create a Sixth Amendment violation. A conflict of interest must first be established. United States v. Burkeen, supra; Lugo v. United States, 350 F.2d 858 (9th Cir. 1965); United States v. Dardi, supra. But where, as here, a conflict is discernible *apart from the trial record*, the warning of *Myers* is quite appropriate. It is inherent in such a case that many intangibles might intervene which would deprive a defendant of a fair trial without it being apparent on the record. In *Glasser*, once the court determined from the record that there was a divergence in what would be proper trial tactics on behalf of each defendant (thus a conflict of interest), it found it inappropriate to attempt to articulate the precise prejudice resulting therefrom. "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." 315 U.S. at 76, 62 S.Ct. at 467. Even if the harmless error rule as enunciated by the Supreme Court in Chapman v. State of California, 386 U.S. 18,

87 S.Ct. 824, 17 L.Ed.2d 705 (1967) is applicable and is followed, as urged by the Attorney General, the court must grant the instant application. It cannot be said beyond a reasonable doubt that the petitioner suffered no prejudice from being represented by an attorney who had a conflict of interest.

The writ of habeas corpus shall issue. Petitioner's conviction is set aside and, unless he is retried within 60 days from the date hereof, petitioner is discharged from the custody of the Warden of Auburn State Prison. This is an order.