[Crim. No. 6575. Fifth Dist. May 31, 1983.]

In re DARREL WADE DARR on Habeas Corpus.

---

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Richard Phillips, Deputy State Public Defender, for Petitioner.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian and Daniel J. Kremer, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and James T. McNally, Deputy Attorneys General, for Respondent.

## OPINION

HANSON (P. D.), J.—In this original proceeding for habeas corpus relief, we set aside petitioner Darrel Wade Darr's 1978 conviction of first degree murder with use of a deadly weapon. We find that defense counsel's simultaneous representation of a key prosecution witness constituted an actual conflict of interest which denied petitioner his right to effective assistance of counsel. We also agree with petitioner's contention that under the circumstances of this case the trial court had a duty to inquire *sua sponte* into the possibility of conflict.

This matter previously was before us on direct appeal. (5 Crim. 4192.) In that proceeding we rejected Darr's contention that he had been denied his Sixth Amendment right to conflict-free counsel and concluded that the record on appeal did not show as a demonstrable reality a conflict which denied Darr effective representation.[1]

Thereafter, Darr filed a petition for writ of habeas corpus in Stanislaus County Superior Court, raising the conflict issue and seeking an order setting aside the judgment. After an evidentiary hearing on an order to show cause before the trial judge, the requested relief was denied. The trial court concluded that ". . . Darr was not deprived of a meaningful defense nor did [counsel's] prior representation of [the witness] in any way affect the quality or vigor of [counsel's] representation of Darr."

Darr then filed a petition for writ of habeas corpus in this court, raising the identical claim of conflict rejected by the superior court. (Cal. Const., art. VI, § 10; see *In re Hochberg* (1970) 2 Cal.3d 870, 873-874 [87 Cal.Rptr. 681, 471 P.2d 1].) An order to show cause issued and certified copies of all pleadings, exhibits and declarations filed in the superior court habeas corpus proceeding were filed here.

### TRIAL EVIDENCE

Paul Larry was stabbed to death about 10:30 p.m. on April 11, 1978. The assailant inflicted 10 wounds with a very sharp double-edged knife, such as a

---

[1]We affirmed the judgment and indicated that any further development of the facts relating to the claimed conflict should be by habeas corpus. (*People* v. *Pope* (1979) 23 Cal.3d 412, 428 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]; *People* v. *Hathcock* (1973) 8 Cal.3d 599, 612-613 [105 Cal.Rptr. 540, 504 P.2d 476].)

stiletto, with a blade approximately 8 inches long. The pathologist testified that Larry might have survived 10 to 15 minutes and could have walked some distance after the attack.

Passersby discovered Larry's body near the intersection of South and Colorado Avenues in Modesto about one-half block from Larry's home. A sheriff's detective followed a trail of blood along Colorado for 106 feet to where blood and disturbed gravel indicated a struggle. No weapon was found.

Adrian Bergaria met decedent, whom she knew from school, outside her house one block from the intersection of South and Colorado Avenues between 9 and 9:30 p.m. Bergaria exchanged greetings with Larry, who said he was going home; he was walking toward Colorado Avenue.

In August the police obtained information leading to Darr's arrest from Charles Allen Fielder. Fielder testified he had known petitioner Darr for "[a]t least five years." On April 11, 1978, about 10:30 in the morning, he and Darr went fishing. While they were fishing, Darr "acted kind of hyperactive [and] didn't want to set [sic] down." Darr spontaneously remarked that "he was foolish enough and stupid enough to do something to somebody."

Darr drove Fielder home in Darr's car, an Opel, at approximately 5 p.m. They arranged to go out together again that evening. Darr picked up Fielder at 6:30 p.m., and they drove to several locations where they drank beer and smoked a "joint." Darr volunteered that he was "foolish enough and stupid enough to get Paul Larry"; Darr also mentioned he believed Larry had been having an affair with Darr's girl friend. Fielder testified he had met Larry only twice.

Eventually, Darr and Fielder went to a place on the river known as the "dust bowl," which is a dirt track for motorcycles. Fielder testified they arrived about 9:15 p.m. and no one else was around. Fielder was tired of sitting and walked down to the river with more beer. He then heard a car engine being started and shifted into gear. Assuming Darr had left, Fielder stayed by the river until about 11 p.m.

When Fielder walked up the riverbank, Darr's car was there and Darr was inside, asleep in the driver's seat, with a sleeping bag over him. Fielder also went to sleep in the car.

Earlier that day, Fielder had seen Darr with two knives which Darr kept in the glove box and took out while fishing. One was white with a blade that pulled open; the other was a black-handled switchblade or stiletto with a blade seven to eight inches long.

The following morning, Fielder noticed Darr was wearing a T-shirt; he had been wearing a purple dress shirt the previous evening. Darr had blood on his hands. Fielder did not see either of the knives that morning. As Darr was driving Fielder home, he told Fielder that " 'if anybody asked about any knife, tell them that we lost them.' " Darr further stated, " 'If anybody asks where we were, we were night fishing all night long.' "

Later the same morning, Darr telephoned Fielder and repeated that, if questioned, Fielder was to say he and Darr were night-fishing all night. Darr then said he "had to hang up because the detectives were there looking for some knives."

On cross-examination, Fielder admitted lying to police officers investigating the killing of Larry on the morning of April 12. He told them he and Darr had been together all of the previous evening and did not mention the blood he had seen on Darr's hands or Darr's statements about the victim.

Fielder indicated that it was in August, while jailed on a felony charge, that he first told police the facts to which he testified at trial. Fielder subsequently pleaded guilty to a misdemeanor, and the district attorney recommended that Fielder be sentenced to jail-time served. Fielder spent 15 days in custody on the offense.

Defense counsel elicited that Fielder was on probation from a prior offense. Fielder was told the new offense constituted a violation of probation, but the hearing on revocation would be held after Darr's trial.

On redirect, Fielder testified that, while he and Darr were at the park on April 11, Darr said he was going to "beat the holy crap out of Larry," and that he (Fielder) lied to police the next day because he was "scared." When questioned by defense counsel, Fielder said neither he nor Darr was intoxicated on the evening of April 11.

Rebecca Fielder, Fielder's 16-year-old sister, testified she saw Darr in his car outside her house about 10 a.m. on April 12, 1978. Darr told her and "Tammy Williams" that he had killed Larry; he pulled out a dark-colored switchblade knife, pushed the button and said if "they" told the cops, "he'd feel like killing somebody else." Darr had blood on his hands and on his pants. Later, in testimony which clearly surprised the prosecution, Rebecca Fielder said she and "Tammy" saw her brother hit and Darr stab Larry at about 9 or 10 o'clock on the night of the homicide. She said the attack occurred near James Marshall Park, on Paradise Road about six blocks from the witness' home.

From the witness' highly contradictory statements regarding "Tammy," and from the testimony of the witness' mother, Betty Jean Fielder, it is doubtful that "Tammy" exists.[2] On the morning of April 12, however, Mrs. Fielder did see her daughter outside talking to Darr, who was in his car. One or two days later, Rebecca told her mother Darr said he killed Larry. She did not tell her mother she saw Darr and her brother in a fight with the victim.

Detective Richard Breashears testified that on the afternoon of April 12, 1978, he searched Darr's car and room with Darr's consent. No switchblade or white-handled knives were found.

### Defense

Terri Lee French, called by the defense, testified that she saw the victim in the early afternoon of April 11 at the apartment shared by Darr, his girl friend, Theresa Bower (Avila), and James Mosely; Larry asked to borrow money to buy a pound of marijuana. When she saw the victim again about 9:30 p.m. he appeared to be "loaded" on marijuana. French stated that Fielder's veracity was "not quite accurate" and that "[h]e likes to fabricate things to make people like him."

On cross-examination, French said Bower had told her after Larry's death that she had been having an affair with the deceased, and that Mosely was aware of their relations. Bower said she was not sure whether Darr knew about this affair; she had seen Darr and the victim exchange words on one occasion. French also testified that she had seen Darr in possession of a black knife with a pushbutton.

Sylvia Heredia, who lived a few houses from the intersection of Colorado and South Avenues, testified that at 10:30 p.m. on April 11 she had seen a large white car parked in front of her house, and a black man standing by the car, looking toward the intersection. Lupe Heredia, who lived in the same house, saw four men standing under a tree at the corner of Colorado and South Avenues shortly after 10:30 p.m.; she did not notice any parked cars.

Fielder, recalled by the defense, said he did not kill or hit Larry; he did not even know the victim. Fielder explained that his sister was mentally retarded.

[2]Mrs. Fielder testified that her daughter was in special education classes "for children that are slow" and that she "fantasized" a lot. Two or three weeks after the homicide, Rebecca started mentioning "Tammy Williams." Mrs. Fielder knew of no such person.

*Rebuttal*

The People on reopening called Brenda Lou Clem, who testified that she was acquainted with both Darr and the victim. Clem said Darr had told her a week or two weeks before the killing he was "going to get Paul" because "Paul was messing with his girlfriend." She had talked to the victim sometime before his death; he said he had heard Darr was after him for "messing with his girlfriend," and that "he wouldn't touch her with a 10-foot pole." When Clem met Darr near Modesto High School two days after the homicide, Darr said, " 'I got Paul.' " When Clem inquired what Darr meant, he said, " 'I killed him.' "

Clem testified she subsequently received 10 threatening phone calls[3] which she reported to police in the early part of May. The caller, whom she believed to be a white male, identified himself as "John." He told Clem "they were going to get some more black people," and said Larry had been killed because "[h]e had been burning people that he was selling dope and stuff." Clem also said she told police the victim had been killed because of his relationship with Darr's girl friend. Because she was scared, she did not mention to police Darr's claim that he had killed the victim.

On cross-examination, Clem admitted she had first contacted the district attorney regarding her testimony the day before she testified. She explained that Martha Larry, presumably the victim's relative, had called her and "said that they needed somebody to testify."

Detective Mac Reece was called by the defense in surrebuttal. He said he had been contacted by Clem in May regarding threatening phone calls. Clem told him the caller said Larry had been killed because "he had burned a lot of people in Modesto," not because of a relationship with Darr's girl friend.

On the second day of deliberations, the jury requested the rereading of Charles Fielder's entire testimony, and the testimony of Brenda Clem. Shortly thereafter, the jury returned its verdict finding Darr guilty of first degree murder with the use of a knife.

### FACTS RELATING TO DEFENSE COUNSEL'S DUAL REPRESENTATION

During cross-examination of Fielder by Darr's attorney, Fielder mentioned he had been represented by Darr's attorney at the hearing at which Fielder entered a plea of guilty to a misdemeanor lesser offense in disposition of an

---

[3]There was no defense objection to this testimony.

August 1978 felony charge. Fielder also indicated he was still on felony probation from a previous offense, and was awaiting notice of the revocation hearing, which had been deferred "until this [trial] was over, . . . "

Pursuant to Darr's request in the appeal, this court took judicial notice of certified copies of court documents relating to witness Fielder's felony probation status and the new offense for which he was arrested in August 1978. These documents, combined with evidence developed at the postappeal hearing in the superior court on the petition for habeas corpus, establish the following.

On June 7, 1977, Fielder was sentenced in Stanislaus County Superior Court No. 144333 upon a plea of guilty to a violation of Penal Code section 4573.6, knowingly possessing unauthorized drugs in prison or jail, a felony. Imposition of sentence was suspended and Fielder was admitted to three years' probation, with a condition that he serve seven months in county jail. The public defender who later was appointed to represent Darr represented Fielder in this matter.[4]

On August 4, 1978, nearly four months after the initial investigation of the Paul Larry murder, complaint No. 27872 was filed in Stanislaus County Municipal Court charging Fielder with the felony of violating Penal Code section 288, committing a lewd and lascivious act on the body of a child under 14. Darr's attorney again represented Fielder.

When arrested on complaint No. 27872, Fielder for the first time implicated petitioner in the Larry murder. On August 16, 1978, pursuant to a plea bargain, the section 288 charge was reduced to a misdemeanor violation of Penal Code section 647a, annoying or molesting a child under the age of 18, and Fielder entered a plea of guilty to the reduced charge with the understanding that the district attorney would recommend that Fielder be admitted to probation on time served. Darr's attorney represented Fielder at this hearing. Fielder was sentenced on September 13, 1978, to time served; a different deputy public defender appeared at the sentencing.

A complaint issued charging petitioner with the murder of Paul Larry on August 9, 1978. Darr was arrested in September; Darr's attorney was appointed on September 18, 1978. On September 25, 1978, the public defender's office received a notice of violation of probation by Fielder. No action was taken to secure Fielder a prompt revocation hearing and the deputy public defender representing Darr did not terminate his representation of Fielder.

---

[4]Hereafter, the deputy public defender who represented petitioner at trial will be described as Darr's or petitioner's attorney.

Darr's attorney represented petitioner at the preliminary hearing on October 13, 1978, and at the trial December 18-21, 1978. At this time, he was still attorney of record for Fielder in the felony conviction matter in which probation revocation proceedings were pending.

Hearings were held January 24 and 26, 1979, after Darr's trial, on the alleged violation of Fielder's probationary status in superior court No. 144333. Darr's attorney, appearing with Fielder, stated there was a possible conflict if the public defender's office continued to represent Fielder; Fielder waived any conflict. On January 26, 1979, Fielder's probation was revoked upon his admission that he had violated its terms; the court readmitted Fielder to probation with a suspended county jail commitment.

Darr's attorney testified at the evidentiary hearing on habeas corpus in superior court[5] that he considered the possibility of a conflict in his representation of petitioner and Fielder at the time of petitioner's trial and concluded that none existed. However, at the time of the hearing in superior court, he believed there was a conflict. Darr's attorney did not tell petitioner he had represented Fielder, or that petitioner had a right to a different attorney if his counsel represented conflicting interests.

Darr's attorney said he did not feel inhibited in his cross-examination of Fielder because he represented the witness; however, he might have proceeded differently on cross-examination had he not represented both defendant and prosecution witness. Petitioner's attorney could not think of any specific questions he would have asked, but said he could think of "a lot of things" he might have done differently in the conduct of petitioner's trial. In retrospect, he thought it "possible" that bringing out on cross-examination the fact that he had represented Fielder might have affected the jury's perception of Fielder as a witness.

During trial, Rebecca Fielder, one of the prosecution witnesses, accused her brother of being involved in the murder; Darr's attorney acknowledged that during the defense case he recalled Charles Fielder to the stand to rebut this accusation.

Petitioner testified he was unaware his attorney had also represented Fielder until Fielder blurted it out at petitioner's trial. Darr said no one explained to him that he had the right to request another attorney in the event of a conflict, and he did not know he had such a right when Fielder testified. Petitioner testified that had he known of this right, he would have asked the court for another attorney.

---

[5] A transcript of that hearing is lodged with the petition.

DISCUSSION

■ This is an original proceeding under the authority of California Constitution, article VI, section 10, and we do not sit as a mere reviewing body. In addressing the issues raised in Darr's petition, we are empowered to evaluate the evidence independently and to reach our own factual determination. (*In re Hochberg, supra,* 2 Cal.3d 870, 873-874, fn. 2; *In re Branch* (1969) 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174]; *In re Wright* (1978) 78 Cal.App.3d 788, 801-802 [144 Cal.Rptr. 538].) Because the superior court judge's determination of the issues was not based on the credibility of the witnesses, and the essential facts are uncontradicted, the judge's conclusions are immaterial to our analysis.

I

The present record shows concurrent representation by petitioner's appointed counsel of clients with conflicting interests; damaging omissions and tactical blunders at petitioner's trial were the result. We disagree with respondent's argument that petitioner has not established that a conflict "deprived him of . . . effective representation."

■ Active representation by one attorney of clients with adverse and conflicting interests denies effective assistance of counsel to a defendant caught in the conflict. (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 345 [64 L.Ed.2d 333, 344, 100 S.Ct. 1708]; *People* v. *Chacon* (1968) 69 Cal.2d 765, 774 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].) Although most of the reported California cases concern codefendants, unquestionably the rule also applies where counsel concurrently represents a criminal defendant and a witness whose interests are adverse. (*Castillo* v. *Estelle* (5th Cir. 1974) 504 F.2d 1243 [concurrent representation of defendant and an individual who was both a government witness and a victim]; *United States* v. *LaVallee* (E.D.N.Y. 1968) 282 F.Supp. 968 [concurrent representation of defendant and important government witness]; see also *People* v. *Anderson* (1976) 59 Cal.App.3d 831, 843-844 [131 Cal.Rptr. 104]; Annot. (1969) 27 A.L.R.3d 1431.)

It is not representation of more than one client which deprives a defendant of his constitutional right to effective assistance of counsel, it is representation of clients with adverse interests. In *United States* v. *LaVallee, supra,* 282 F.Supp. 968, 971, the court described the hazards of dual representation of a defendant and an important prosecution witness who was under indictment in another case: "It takes no great imagination to detect the potential dangers that faced the petitioner by being defended by an attorney who was also representing an important prosecution witness. Cordova, a known narcotics addict, had a felony indictment hanging over him at the time he testified against the petitioner. The

possibility existed that Cordova thought that he could secure more favorable treatment from the District Attorney and from the courts if he cooperated with the State in the prosecution of another case. In fact, Cordova did subsequently plead to a reduced charge and did receive as his sentence time already served. If Cordova chose to lie, in order to gain for himself such favorable treatment, a vigorous cross-examination by petitioner's attorney would be the way to expose, for example, a possibly false identification of petitioner by the police officers. The knowledge that Cordova has a felony charge pending against him might have reduced [defense counsel's] zeal in cross-examining him, one of his clients—favorable treatment for Cordova could not be expected if he were proven to be a liar. Even if [defense counsel] were not himself involved in any deal to obtain Cordova's testimony, as an experienced criminal attorney he was surely aware that Cordova's subsequent treatment might depend on his performance at petitioner's trial. That Cordova might have fulfilled a bargain with the District Attorney is not an unreasonable inference to draw, and the existence of such an arrangement would establish a conflict of interest in [defense counsel] between the petitioner and Cordova. A second danger in being represented by an attorney who is also representing a prosecution witness is that the scope of examination of the witness by the attorney might be restricted by the fact that the attorney has learned confidential information about his client-witness which cannot be revealed."

The appellate record did not reveal whether Darr's attorney, at the time of the murder trial, had divested himself of a continuing obligation to Fielder, or whether Darr had waived any conflict. These factual gaps have been closed.

The present record, as augmented by the transcript of the evidentiary hearing in superior court, shows without contradiction that trial counsel simultaneously was representing clients whose interests were adverse. Darr's attorney's representation of Fielder, together with his obligations of loyalty and confidence, continued throughout the attorney's representation of petitioner.

The interests of petitioner and Fielder clearly were adverse. That Fielder implicated petitioner in the murder in the first instance because Fielder had been jailed on the Penal Code section 288 charge and hoped to help himself in the prosecution of that charge by providing information against his friend "is not an unreasonable inference to draw, . . ." (*United States* v. *LaVallee, supra,* 282 F.Supp. at p. 971.) A plea bargain was reached on the section 288 charge, with petitioner's attorney representing Fielder, before petitioner's trial. Although Fielder had served the sentence on the new offense, probation revocation proceedings were continued until after Fielder testified against petitioner, a clear incentive for Fielder to cooperate with the prosecution.

There is no doubt that Darr did not waive the conflict. Petitioner testified at the habeas corpus hearing in superior court that he knew nothing of the dual representation until trial was in progress. ■ "It is well settled that a defendant is denied his constitutional right to the assistance of counsel if his attorney represents conflicting interests without his knowledge and assent." (*United States* v. *LaVallee, supra,* 282 F.Supp. at p. 971.)

As a matter of federal constitutional law, a conflict must be "actual"; the "mere possibility of conflict" is insufficient to implicate Sixth Amendment rights. (*Cuyler* v. *Sullivan, supra,* 446 U.S. 335, 345, 348 [64 L.Ed.2d 333, 345, 346].) The majority opinion in *Cuyler* did not define the difference between "actual" and "possible" conflict; however, in a concurring and dissenting opinion, Justice Marshall explained: "There is a possibility of conflict . . . if the interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties. There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action." (*Id.,* at p. 356, fn. 3 [64 L.Ed.2d at p. 351].) ■ A reviewing court may use hindsight to determine whether an actual conflict existed. (*People* v. *Angulo* (1978) 85 Cal.App.3d 514, 519 [148 Cal.Rptr. 517].) If the court finds such a conflict, and determines that the conflict affected counsel's performance, reversal is automatic. (*Cuyler* v. *Sullivan, supra,* 446 U.S. at pp. 349-350 [64 L.Ed.2d at pp. 347-348]; *Glasser* v. *United States* (1942) 315 U.S. 60, 76 [86 L.Ed. 680, 702, 62 S.Ct. 457].) "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." (*Cuyler* v. *Sullivan, supra,* at pp. 349-350 [64 L.Ed.2d at p. 347].)

Under *Cuyler,* if the record shows that counsel in representing clients with conflicting interests does something or omits to do something contrary to what is expected of a reasonably competent attorney under like circumstances, an actual conflict is shown and reversal is required without a showing of prejudice. In *Glasser* v. *United States, supra,* 315 U.S. 60, defense counsel representing codefendants failed to object to hearsay inadmissible as to one client; the court found this ". . . indicative of [counsel's] struggle to serve two masters . . . ." (*Id.,* at p. 75 [86 L.Ed. at p. 702].) The Supreme Court reversed, finding impermissible conflict: "Our examination of the record leads to the conclusion that [counsel's] representation of Glasser was not as effective as it might have been . . . . We hold that the court . . . denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment." (*Id.,* at p. 76 [86 L.Ed. at p. 702].)

■ Looking at the total case, an actual conflict is demonstrated in the record. Fielder was an extremely important witness against petitioner. His

statements to police led to the arrest and charging of petitioner. Fielder's trial testimony established that petitioner had the opportunity, means and motive to commit the killing. Fielder's testimony was the cornerstone of the prosecution's case. In the face of the evidence of guilt, defense counsel presented little defense, but relied on weaknesses in the prosecution case, and particularly, attacks on credibility of prosecution witnesses. In *Cuyler,* a similar approach was held to be a "reasonable tactical response" under the circumstances (see *Cuyler* v. *Sullivan, supra,* 446 U.S. 335, 347-348 [64 L.Ed.2d 333, 345-346]); accepting that strategy in this case, impeachment of prosecution witnesses—especially Fielder—was crucial.

The dual representation appears to have affected counsel's performance in several areas. Petitioner's attorney did not seek to obtain a timely probation revocation hearing in Fielder's felony case. Obviously, it was not in Fielder's interests to do so, as the decision whether to continue Fielder on probation might be influenced favorably by a showing that Fielder cooperated in the prosecution of petitioner. On the other hand, had Fielder's revocation hearing proceeded prior to petitioner's trial, the results of such hearing might have provided further grounds for impeachment of the witness, regardless of whether Fielder's probation were revoked.

Further, unexplained omissions exist in Darr's attorney's cross-examination of Fielder for bias. Notably, petitioner's attorney did not ask Fielder at trial whether the witness was aware of the term he faced if his probation were revoked, or whether Fielder had agreed to testify in return for a promise or hope of lenient treatment.[6]

Petitioner's attorney effectively elicited that Fielder implicated Darr for the first time after Fielder had been arrested and was in jail, facing a felony charge and revocation of his probationary status. However, when the witness freely admitted that he lied to the police when they first approached him, and explained that he lied because he was afraid, it was crucial to expose any considerations of leniency influencing Fielder's decision to testify against his friend.

Here, both the plea to the misdemeanor on the new offense and the suspension of probation revocation proceedings brought out by Darr's attorney on cross-examination could suggest a deal—an express or implied agreement whereby the witness received strong inducements to testify against Darr ac-

---

[6]Fielder's convictions and the pendency of revocation proceedings are matters of public record. However, the content of discussions between Fielder and Darr's attorney regarding the charges and the best plan to defend against them were privileged. (Evid. Code, §§ 952, 954, 955; see *In re Navarro* (1979) 93 Cal.App.3d 325 [155 Cal.Rptr. 522], discussing the scope of the attorney-client privilege.)

cording to his second statement to police. Yet petitioner's attorney did not ask the obvious questions: Did Fielder agree to testify against Darr in exchange for a favorable disposition of the charges? Did the outcome of the pending probation revocation hearing depend on Fielder's trial testimony? Was Fielder led to believe he would receive better treatment if Darr were convicted? Was Fielder aware of the possible consequences if his probation were revoked and he was sentenced to prison? A reasonable inference may be drawn that defense counsel did not ask these questions because such inquiry would reach confidential communications with Fielder regarding the advisability of the course of action taken, whether or not there was an express arrangement with the prosecution.

Defense counsel did argue to the jury that Fielder was a liar and had a motive to fabricate in order to improve his own chances.[7] Nonetheless, it is evident that Darr's attorney's efforts were limited by his ongoing relationship with the main prosecution witness. Fielder's cooperation as a prosecution witness only could benefit him in his upcoming probation revocation hearing and his attorney, who now represented Darr, was ethically bound to advance and protect this objective. Petitioner's attorney also owed a duty to petitioner zealously to attempt to undermine Fielder's credibility by all means available. "The Constitution assures a defendant effective representation by counsel whether the attorney is one of his choosing or court-appointed. Such representation is lacking, however, if counsel, unknown to the accused and without his knowledgeable assent, is in a duplicitous position where his full talents—as a vigorous advocate having the single aim of acquittal by all means fair and honorable—are hobbled or fettered or restrained by commitments to others." (*Porter* v. *United States* (5th Cir. 1962) 298 F.2d 461, 463.)

Most troubling is Darr's attorney's "rehabilitation" of Fielder in putting on the defense case after Rebecca Fielder implicated Fielder as an accomplice to the murder. Although even the prosecutor said that Rebecca had "flights of fantasy," the action of Darr's attorney in recalling Fielder to impeach this testimony could serve only to enhance Charles Fielder's credibility. Finally, we are concerned that an aura of credibility or an approval of Fielder and his conduct in testifying against petitioner was created when the jury learned that Darr's attorney represented Fielder *after* Fielder had implicated petitioner.

The record as a whole shows that Darr's attorney's continuing obligation to Fielder, whose interests were adverse to petitioner's at the time of petitioner's trial, adversely affected counsel's performance in several significant respects. Because the record reflects an actual conflict of interest, petitioner's conviction must be set aside, regardless of whether actual prejudice can be shown. (*Cuyler*

---

[7]We repeat a statement from our prior opinion that there is no indication petitioner's attorney acted other than in good faith.

v. *Sullivan, supra,* 446 U.S. 335, 349-350 [64 L.Ed.2d 333, 347].) "The conflict itself [demonstrates] a denial of the 'right to have the effective assistance of counsel.' [Citation.]" (*Id.,* at p. 349 [64 L.Ed.2d at p. 347].)

## II

■ Petitioner correctly contends the trial court erred in failing to inquire concerning a possible conflict or to advise petitioner of his right to conflict-free representation when it was revealed during trial that petitioner's attorney had represented Fielder.

Under *Cuyler* v. *Sullivan, supra,* 446 U.S. 335, 347 [64 L.Ed.2d 333, 346], a trial court has no affirmative duty to inquire into multiple representation unless it "knows or reasonably should know that a particular conflict exists. . . ." In *Wood* v. *Georgia* (1981) 450 U.S. 261 [67 L.Ed.2d 220, 101 S.Ct. 1097], the petitioners, former employees of an "adult" bookstore and movie theatre, had been convicted of distributing obscene materials and faced jail terms upon revocation of probation for failure to pay fines imposed. The Supreme Court found the record demonstrated that "the *possibility* of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." (*Id.,* at p. 272 [67 L.Ed.2d at pp. 230-231].) The court noted petitioners' counsel had been retained by the employer, who might have refused to pay the fines in order to precipitate a test case on the equal protection issue whether offenders may be jailed for failure to pay fines beyond their means. The court vacated the judgment and remanded the matter with instructions to hold a hearing on the conflict question and thereafter to grant appropriate relief.

In *People* v. *Elston* (1982) 130 Cal.App.3d 721, 730 [182 Cal.Rptr. 30], this court held the trial court erred in failing to inquire into the possibility of conflict in counsel's representation of codefendants. We concluded, however, that no purpose would be served by a remand for further hearing as in *Wood,* because the record disclosed an actual conflict of interest.

Here, it was brought out on cross-examination that Darr's attorney recently had represented Fielder in a criminal matter and that a hearing on revocation of felony probation was pending. Fielder testified he had received notice that the hearing on probation revocation would be held after petitioner's trial. On redirect, the prosecutor verified that it indeed was petitioner's attorney who had represented Fielder.

This information, developed in open court, sufficiently raised the "possibility of conflict" (*People* v. *Elston, supra,* 130 Cal.App.3d 721, 730), and should have prompted the court to conduct an inquiry. However, the memorandum of

decision in the superior court habeas corpus proceeding clearly indicates that no inquiry regarding a possible conflict was made by the court at any time, and there was no discussion of the matter by counsel. As discussed above, Darr was not informed of his right to conflict-free counsel by his attorney or the court.

The trial judge or either attorney could have initiated a hearing outside the presence of the jury to determine the facts, to inform petitioner of his right to conflict-free representation, and to inquire whether Darr desired new counsel or preferred to continue with counsel who represented Fielder, waiving any right to object.[8] The court's failure to hold such a hearing under the circumstances shown was error of constitutional proportions. (*Wood* v. *Georgia, supra,* 450 U.S. 261, 272, fn. 18 [67 L.Ed.2d 220, 231].) Where, as here, the record developed through habeas corpus proceedings clearly demonstrates an actual conflict, reversal is mandated; remand for further inquiry by the trial court would be an idle act. As sufficient evidence supports the judgment, there is no legal bar to retrial.

The writ is granted; the judgment is vacated, and the matter is remanded to the trial court.

Brown (G. A.), P. J., and Woolpert, J., concurred.

---

[8]A hearing also would have allowed the court an opportunity to inquire whether Fielder's rights were being protected in his testimony under oath by advice of independent counsel. Such a hearing might have prevented multiple posttrial proceedings and a retrial. It is difficult to explain to juries and to the taxpayer that "expediting" cases and trials does not always serve the public interest; this case demonstrates the importance of "care" and the sensitive balancing act imposed upon California trial judges and trial attorneys.